The next case is Laboratory Corporation of America v. Ravgen, 2023-1342. Mr. Castanhas, good morning. Good morning. Good morning, Your Honors, and may it please the Court. I'd like to shape this morning's argument around three basic legal principles that, when they're corrected, should compel reversal in this case. The first one is that this Court's motivation to combine law does not require that a combination be the best possible combination, that it be perfect, that it be free of any weaknesses or flaws. It only requires that the combination be a suitable one from which the art does not teach away. That's important in this case because when the art here showed suitability, the Board repeatedly demanded perfection, and the Board plainly, and by Ravgen's own admission, made no teaching away finding. The second legal principle is set forth in this Court's fairly recent axonics decision, though that reflects a much longer line of this Court's precedent. Obviousness tests whether a person of ordinary skill would have been motivated to make a combination to arrive at the limitation of the challenged claims. And that's important here because these claims contain only two limitations. They're very broad. The limitations are fetal DNA and a cell lysis inhibitor, and that's only conditional. That's only if cells are present. And they do not contain any limitations having to do with maternal DNA leakage, fetal DNA damage, or fetal DNA concentration. Mr. Castanis, this is a rather strange claim. Never comprising determining the sequence, but then the rest of the claim recites nothing about determining the sequence. That's right. It just talks about the starting material. That's exactly right. They're extraordinarily broad, virtually limitless. And in fact, Judge Lurie, if you look at the language that was used by Ravgen's counsel in the underlying Waco litigation, this is what he argued to the jury in closing. Quote, all that's required is you've got to have baby DNA and you've got to have formaldehyde. And that's to infringe claim 132. But there were factual determinations, weren't there, that formaldehyde can damage the DNA? And that was extraordinarily well known, and both the Rao reference, which the board did not read for all that it taught, as well as Dr. Edwards' testimony, which the board only selectively quoted, said that a person of ordinary skill within the exercise of his or her ability would know how to adjust things like concentrations and other external circumstances to limit damage. And those factual findings were, of course, infected by my third point, which is that the error that dispropriates this record is this. Even when the board purported to make factual findings, it violated the rule of substantial evidence review set forth in this court's decisions like Dartside, OSI, tracing back to the Supreme Court's decision by Justice Frankfurter and Universal Camera. The substantial evidence review requires the court to take into account evidence that both justifies and detracts from the finding. And here, the board engaged in extraordinarily selective evaluation of the evidence. As I mentioned, it didn't take into account at all Rao's teaching that, and here, the language of Rao is that the description of stabilizing agents, and this is, by the way, in this record, because it's also in the 720 appeal. In this record, this is at A17658, crossing over to Appendix 17659. Rao says, the description of stabilizing agents herein implies using these agents in appropriate concentrations or amounts, which would be readily apparent to one skilled in cell biology where the concentration or amount is effective to stabilize the target cells without causing damage. One using the compositions, methods, and apparatus of this invention for the purpose of preserving rare cells would obviously, what would obviously is actually in Rao, not use them in ways to damage or destroy these same rare cells and would therefore inherently select appropriate concentrations or amounts. That's what Rao taught. The board ignored that. Edwards talked about that in his testimony. The board shut that aside in favor of only a selective quotation of what Edwards said. How could you say the board ignored all this? For instance, hopefully I've got the right case here, A108. Finally, we agree with patent owner that in as much as petitioner suggesting a POSA might simply tailor the process and conditions for using formaldehyde effectively, petitioner argument fails and goes on to analyze the evidence. Isn't that adequate consideration of the argument that you're making here? It's not adequate consideration of the argument because what the board was doing there of course is making a finding to the extent that it's considering the evidence at all that's completely infected by my first point, which is the board's demanding perfection out of the combination where the law only requires suitability. And that's really the fundamental purpose of the law. But the board specifically said that. I'm sorry, just so I said it in the first part. The board specifically said that they recognize that suitability is the test. I mean, it seemed to be arguing, well, they didn't really apply that. That's right. But reading their multiple decisions in these cases, it seemed to me that they were being actually quite extensive in their weighing of the pros and the cons of formaldehyde, which they recognize, as do the references, was a nasty, is nasty stuff. It's dangerous. It has limitations on its use. And yet, under the right circumstance, as the patentee seems to have discovered, it can be workable. But that seems to me to say that they were actually just looking for the perfect solution is right by their analysis of the pros and the cons of these various solutions to the problems. Judge Bryson, I think you've actually put your finger on what we think is the problem with this, actually both board decisions, but this board decision that we're talking about right now. And that is that the board weighed the pros and cons in a way that the suitability requirement of this court's decision says, well, that's for the person of ordinary skill to do. The person of ordinary skill is going to weigh the pros and cons. And that person of ordinary skill is going to say, do these pros and cons say halt, like United States versus Adams says? That's to deter any investigation? Or is the person of ordinary skill going to do, like Rao said, adjust concentrations, adjust the environment in which the formaldehyde is used? And say, no, this is going to suggest further investigation. This is going to suggest let's at least give this a shot. Formaldehyde, as you pointed out, Your Honor, has been around forever. The Srinivasan reference in this case points out it's been around forever. In fact, Srinivasan, which both parties put into the record here, and the board quoted Srinivasan at 29-607. This is the quote from Srinivasan. Srinivasan said that attempts to extract usable DNA from formalin, and that's aqueous formaldehyde, formalin-fixed tissues for molecular biological studies have been variably successful. The board said that was evidence against the combination. Under this court's law, that was evidence that compelled the combination. There was some success. Yes, there were concerns, but that's okay under this court's law. The problem-  At some point, the concerns outweigh the motivations, it seems to me. And as I read what the board is saying, they said, this is not, there are enough red lights or blinking yellow lights here with respect to formaldehyde that a person of ordinary skill would not have been directed to using formaldehyde as the fixing agent. I think that when you have blinking yellow lights, that's exactly what this court's law says. The blinking yellow lights aren't enough. Again, the law says the combination does not have to be the best option. It only need be a suitable option from which the prior art does not teach away. Where else if anywhere have we said or suggested that blinking yellow lights compels a finding of motivation to combine, as if there's no fact-finding at all? That is, I don't see how it's enough for you to sort of get the evidence to a draw or maybe even a slight balance in favor of using formaldehyde. There's still a role for the fact finder, the board here, to weigh all that and decide whether you prove motivation to combine. Of course there is, but it has to be done under the proper legal standard. And this board, while it inverted to the proper legal standard, clearly was not applying because it was selective in its selection of the record evidence. It only selected the record evidence that worked in favor of the finding that it wanted to make. And on top of that, its demands for formaldehyde, the oldest fixative known, as Srinivasan pointed out, something that everybody would have immediately thought, let's try this off the shelf. And yes, we know from Srinivasan, from all of these other references, that there may be problems, but the solutions are right there. In fact, they're on the face of Srinivasan. They're on the face of Rao. Yellow light, sure, but the person of ordinary skill also knows how to deal with that. And the board ignored, it ignored Judge Stark, the evidence from Rao, from Edwards, that said that. It's just not treated. And under the substantial evidence standard, that can't stand. Bianchi and Rao were known suitable options to solving the known problem of cell lysis in a sample like this. And the board, and while of course we can't use the 277 patents of Roadmap to go backwards, it is significant, as Judge Lurie stated at the outset. But these claims really don't have anything to do with determining the sequence. They have to do with what you put into the mix. And what the alleged inventor did in this case, was just put formaldehyde in, or put fixatives in. There's nothing in these claims that are being challenged here that has anything to do with preventing leakage, that has anything to do with preventing cell damage, that has anything to do with maximizing the quantity of cell-free fetal DNA in the ultimate mixture that's being analyzed. All it is, again I come back to the words of trial counsel, that got a nine-figure judgment against our client that still hasn't gotten it. I mean, I looked at that closing argument of Mr. Damaris. It was a different claim, right? No, it's the same claim 132 that's at stake in this case. I thought you were 55. Well, 55 is the independent claim, but 132 depends. Several pages earlier, he says there's a lot more to this claim. He's just telling the jury he's going to focus on what's at dispute at the trial, isn't he? I don't think that's a fair reading of what the case was about. You're not saying they're stopped from making the arguments. No, but that case may be here eventually. But they played fast and loose with this record, and they have not made clear as to why that statement is any different than what we're dealing with here. I'm into my rebuttal time. Unless the Court has further questions, I'll return on rebuttal. We will serve it for you. Mr. Matty. Good morning. Brian Matty for RabGen. May it please the Court. Your Honors, the appellant here stretches to manufacture legal errors in the Board's decision to avoid the substantial evidence review. The Board here took a careful approach under the proper obviousness framework to reach its decisions, and it took three important steps along the way in reaching those decisions. First, the Board repeatedly focused its analysis on the important claimed context of cell-free fetal DNA analysis. Second, the Board examined whether the formaldehyde combinations that had been proposed would have been suitable options without requiring that any combination be the best or that it be perfect. And third, the Board performed a detailed analysis of the voluminous evidence and record below and explained why, on balance, that evidence favored RabGen and found no motivation to combine. And the Board did that for two separate and independent rationales and bases that are laid out in its decision and ultimately concluded at Appendix 100 that the patent owner's evidence separately and cumulatively outweigh petitioner's comparatively weak showing on the question of whether a person of ordinary skill in the art would have combined the art in the manner proposed. So, turning to the first point, the Board was focused on cell-free fetal DNA analysis throughout its decisions and throughout its findings. And that's important because it is the context of the challenged claims here. As Your Honor referenced, Claim 55 recites in its step determining the sequence of a locus of interest on free fetal DNA isolated from a sample. So you have to have free fetal DNA that's isolated from a sample and you have to be able to determine the sequence of that DNA. And that context is important in this case and in all these decisions because that field of free fetal DNA analysis was a new and unknown and nascent field at the time of the invention here. And there were important differences with cell-free fetal DNA that made it different from other things like cellular DNA that researchers had been studying previously. And the Board acknowledged this at Appendix 103 in their decision. They said right up front, cellular DNA and cell-free DNA are not the same thing. And they supported that finding with the record and the evidence showing that there were important differences with the cell-free fetal DNA analysis that was claimed. That included evidence from Streck, who is the manufacturer of blood tubes that are used now in cell-free fetal DNA analysis. The Board cited Mr. Hunsley from Streck, who talked specifically about cell-free fetal DNA and explained how it presents what he called an obstacle. Where are the steps constituting the method comprising determining the sequence? I'm sorry, Your Honor? The Claim 55 recites a method of determining the sequence. A method requires steps. Where are the steps for determining the sequence? In the independent claim, there's one step. It's determining the sequence of a locus of interest. And that locus of interest has to come from free fetal DNA that is isolated from the sample. So in other dependent claims, it gives specifics about how you do the analysis. But in the independent claim, the analysis is the step of determining the sequence of free fetal DNA that's been isolated from the sample. Now, in addition to Mr. Hunsley's testimony regarding the obstacles of cell-free fetal DNA, where he noted that it was small, quantities were limited, and that it could be easily damaged, and cited those as important new issues with cell-free fetal DNA, the Board analyzed the testimony from both sides' experts, including Dr. Edwards from LabCorp. And the Board noted Dr. Edwards agreed with the way that Mr. Hunsley framed this problem. Dr. Edwards agreed the list is quite long in terms of the differences and the important differences between cell-free fetal DNA and cellular DNA. And Dr. Edwards agreed with some of the same obstacles and same differences that Mr. Hunsley had noted, including that it was small, it was a limited quantity, and it could be damaged. That's why the context of cell-free fetal DNA analysis, the cell-free fetal DNA that is claimed in these claims, that's why it's important. And that's also why when Dr. Dilan came up with his inventions, and he published about it in some of the foremost medical journals in the world, there was commentary with it that called it a promising and new era in prenatal diagnosis. Let's move on to formaldehyde, which I think is at the key to the appeal. Absolutely. It seems that everybody acknowledges there were pros and cons to using formaldehyde in this new context of cell-free fetal DNA. But the argument from the appellant is that the Board did not carefully analyze and fairly analyze all the many references that say formaldehyde is sort of a stabilizer of choice. It is in all these other areas. One of skill in the art would certainly know how. It would be obvious to tailor the amount. And the Board really didn't grapple with that. I assume you disagree, so help us understand where we can see that the Board actually fully and fairly considered all of that evidence. Absolutely. I do disagree, Your Honor, just to be clear. The Board performed a very detailed analysis of all of that evidence, including the quotes and citations and references that opposing counsel just talked about. They did the required careful weighing of that evidence in their decisions. It all starts from KSR. In the KSR framework, as we all know and we've heard over and over, there's flexibility. There's no rigidity. It takes a holistic approach to evaluating all of the evidence, the evidence both for and against motivation to combine. The Board did that here. Following this Court's guidance in, for example, the Arctic Cat case, the Board noted that the prior art and the knowledge of a skilled person, it might present a motivation or reason to combine. But the prior art and knowledge of a skilled artisan might also provide reasons not to combine, which would likewise be a question of fact. That's what this Court has held. The Board looked at that and it said it goes through pages reciting all the patent owner's evidence, all the petitioner's evidence, and then in its analysis it carefully weighs those two to conclude at Appendix 99 to 100 that ultimately there are two rationales upon which the evidence shows there was no motivation to combine here. The first of those in the Board's decision at Appendix 99, the Board found that a person of ordinary skill would have been dissuaded from adding Bianchi's paraformaldehyde to cell-free fetal DNA analysis because of gaps in the cell membranes providing a means for maternal DNA to escape into the sample. That was the Board's conclusion. Then in the pages that follow, Appendix 100, 101, the Board goes on to perform exactly this weighing of the evidence that Your Honor is asking about and explains why it made that finding on DNA leakage. The Board again addressed the expert testimony that was in the record It credited the opinion of Dr. Van Ness from RabGen who had explained that Bianchi creates a means for cellular DNA to escape, but it didn't just stop there. It didn't ignore lab corpse evidence. It went on to address it. It talked specifically about Dr. Edwards at Appendix 101. The Board noted concessions from Dr. Edwards that DNA leaking out of cells is one thing that Chu tells you you do not want to happen. It also addresses admission that Bianchi's treatment will cause gaps in the cell membrane and will allow that DNA to leak. So in doing this careful weighing of the reasons for and against the motivation, the Board weighed it all and addressed both sides' evidence. How about at the reply brief at 17, they specifically, that is, LabCorp says that the Board did not consider Rao's explicit teaching that a person of skill in the art knows how to handle concerns about formaldehyde. Dr. Edwards gave related testimony supporting that. Where does the Board address Rao's explicit teaching on that point? The Board takes that head on in two ways. It addresses Rao and notes that Rao is, again, about the cellular DNA analysis not about cell-free DNA analysis. It's statements about a person of ordinary skill knowing how to use formaldehyde in the context of what Rao was doing in the cellular world. Why that doesn't necessarily apply to cell-free fetal DNA because of its uniqueness. The Board, at Appendix 105, talks about that and at Appendix 113. It notes that in papers like Rao, the plasma was not studied. The plasma was the portion of the sample that was routinely discarded and no one had ever looked at it. It notes first that Rao itself doesn't talk about cell-free fetal DNA and how to use formaldehyde to analyze it. But then the Board went further and said, with the general knowledge of a person of ordinary skill and with Dr. Edwards' testimony that someone would know how to tailor the use of formaldehyde, what do we have there? The Board found at Appendix 106 that there was a, quote-unquote, dearth of evidence for formaldehyde being used where cell-free fetal DNA is the analyte and that there had been no sufficient persuasive evidence or technical reasoning provided by LabCorp for using formaldehyde with cell-free fetal DNA and specifically addressing the Srinivasan reference that LabCorp preferences and Dr. Edwards' testimony that one would be able to use Srinivasan to tailor formaldehyde's use. The Board at Appendix 107 addressed that and it noted that that argument, using Srinivasan in its criteria, in the Board's words, stands in tension with the motivation to combine that Dr. Edwards and LabCorp had presented in the first place where they wanted to preserve samples for up to 48 hours. The Board took all of that head-on through all of its detailed analysis in performing this careful weighing that this Court has instructed is the proper way to do the analysis. In response to Judge Stark's earlier question, you said there were two general ways in which the Board explained its take on the evidence and you first started by referencing to the fact that a person of learning skill would be dissuaded by the gaps caused in the cell membranes. Perhaps you covered the second in the rest of your discussion but I wanted to know if there was a second category of Board treatment of this issue. Absolutely. Thank you, Your Honor. The second rationale was the Board's finding that a person of ordinary skill in the art would have been dissuaded because of formaldehyde's potential to damage DNA. In the briefing, the parties treat this as two rationales that we call DNA leakage and DNA damage. When I said there were two rationales, that's what I'm referring to. On the second one, the Board again performed this careful weighing of the evidence and reached its conclusion this time at Appendix 100 that on the DNA damage question a person of ordinary skill would have been dissuaded from adding formaldehyde to cell-free fetal DNA samples because formaldehyde was known to damage nucleic acids. Damage would include the irreversible cross-linking? That's right. What the Board went through was one of the references. That's exactly right. Was that in Rau? The Board walked through all of that evidence, specifically at Appendix 106. Again, they credited Dr. Van Ness' opinion for Ravgen that the formaldehyde concerns would have dissuaded formaldehyde's use with references like CHU and cell-free fetal DNA analysis. They cited the specific concerns in Rau and in Shrinivasan which talked about DNA degradation and DNA denaturation and also the Swenberg reference which talked about DNA breaks, DNA protein cross-links and aberrations and mutations in DNA. Again, on this ground too, they didn't stop there. They looked to testimony from even LabCorp's experts and included that in their weighing of the analysis. They referenced testimony from a LabCorp expert, Dr. Dumont. His opinions are at Appendix 31272-273 where Dr. Dumont for LabCorp agreed with some of those dangers of formaldehyde. He says it degrades nucleic acids. It inhibits PCR. It's not compatible with standard methods used to analyze DNA. It was at paragraph 390 of his opinion there. Again, the Board is not ignoring LabCorp's evidence. It's not ignoring LabCorp's experts. It's taking it into account and explaining why it's consistent with the Board's ultimate findings. A couple other points in rebuttal to what we heard from LabCorp. They mentioned the Exonix case. This is not the Exonix case. In Exonix, at page 957 of that decision, this court faulted the Board for improperly confining the obviousness inquiry to the context of the prior art, which there was different than the context of the claims. We don't have that problem here because as I explained, the claims, in the context of the claims here, is cell-free fetal DNA analysis. That's what the Board analyzed and that's what the basis of the decisions was. We don't have a disconnect here between what the Board's looking at in the context of the claims. LabCorp also mentioned statements that were made in closing arguments in the trial down in Texas. I want to be very clear. RavGen did not take the position at trial, has never taken the position in the IPRs. You can just ignore the other limitations of the claim. You have to have an agent that inhibits cell lysis. You have to determine the locus of interest of fetal DNA. It has to be isolated from a maternal sample. We've always taken that position. The arguments in the closing that are being taken out of context actually responded to an argument that LabCorp was making in that case, where they said they don't use formaldehyde directly. They use formaldehyde releasers. They had implied to the jury that that meant they didn't infringe. That's the argument that was being made by RavGen's counsel. There's no limitation in these claims on how you deliver the formaldehyde, whether you use a formaldehyde releaser or deliver it directly. There's no tension with those arguments here. Thank you, counsel. Thank you, John. Mr. Castanis has some rebuttals on. Two and a half minutes. Thank you, Your Honor. Pros and cons. Judge Bryson, Judge Stark, you both asked about those. The board talked about Rao. The board talked about Dr. Edwards. What the board didn't talk about was Rao's teaching of what a person of skill of the art in cell biology would know and know how to do. I read that to you in my opening argument. My friend here did not show you anywhere where the board addressed that aspect of Rao. In our briefs we've made the point that the board did not read the references for all that they teach. That's one of the problems. Secondly, my friend tells you that the board considered Dr. Edwards' testimony. Yes, some of it. Not all of it. It also considered Dr. Van Ness'  It considered some testimony from each of the experts. What I want to point out here, Judge Lurie, is that what the board didn't consider and what you didn't hear my friend say is that the board considered Dr. Edwards' testimony that he wouldn't be concerned about the negative impacts of formaldehyde on DNA. Why was that? By the way, that is at page A28986 or appendix A28986 of the record. Why did he say that? For the same reasons, that Rouse said a person of ordinary skill would understand how to adjust the amounts and conditions of formaldehyde. My friend did not at all address the board's fundamental misreading of Bianchi where it absolutely misread Bianchi as not speaking at all to using formaldehyde as a fixative when it plainly does. That's at page 17648 of the appendix. Axonics. My friend talked about how the CFF DNA context was ignored by us. It wasn't ignored. Chu and Low were our primary references. What he's relied upon here was the Hunsley Declaration, which was dated 2017, far after the date of the patent, which references the 2013 publication. That shouldn't have been relevant to what a person of ordinary skill would have understood. With regard to the Axonics point, my friend talked about the testimony about Chu telling you that you do not want leakage. That's the Axonics error that our brief talks about here because the board said that the specific combination of Chu with the other references would not create the proper obviousness reference. Of course, Axonics says don't require the limitations of the prior art. Look to the limitations of the claims. These claims are as broad as they are obvious. The judgment should be reversed.